Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS JAFFEE derivatively on behalf of C3.AI INC., | |
| Plaintiff, | Case No.: |
| v. | |
| THOMAS M. SIEBEL, HITESH LATH, KR SRIDHAR, RICHARD C. LEVIN, MICHAEL G. MCCAFFERY, BRUCE SEWELL, LISA A. DAVIS, STEPHEN M. WARD, JR., ALAN MURRAY, JOHN HYTEN, KENNETH A. GOLDMAN, CONDOLEEZZA RICE, and JIM H. SNABE | **DEMAND FOR JURY TRIAL** |
| Defendants, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| and | |
| C3.AI INC., | |
| Nominal Defendant. | |

## INTRODUCTION

Plaintiff Dennis Jaffee ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant C3.ai, Inc. ("C3" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Thomas M. Siebel ("Siebel"), Hitesh Lath ("Lath"), KR Sridhar ("Sridhar"), Richard C. Levin, ("Levin"), Michael G. McCaffery ("McCaffery"), Bruce Sewell ("Sewell"), Lisa A. Davis ("Davis"), Stephen M. Ward, Jr. ("Ward"), Alan Murray ("Murray"), John Hyten ("Hyten"), Kenneth A. Goldman ("Goldman"), Condoleezza Rice ("Rice"), and Jim H. Snabe ("Snabe") (collectively, the "Individual Defendants," and together with C3, "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of C3, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under sections 10(b) and 21D of the Exchange Act against Defendants Siebel and Lath. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding C3, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 26, 2025 through August 22, 2025, inclusive (the "Relevant Period").

2.    C3 is a Delaware corporation headquartered in Redwood City, CA, that trades as "AI" on the NYSE. C3 defines itself as an "Enterprise AI application software company" whose main products are: (1) C3 Agentic AI Platform, an "end-to-end platform for developing, deploying, and operating Enterprise AI applications;" (2) C3 AI Applications, a "portfolio of industry-specific Enterprise AI applications;" and (3) C3 Generative AI, a "library of agentic AI applications to retrieve data, analyze information, surface insights, and orchestrate workflows to drive business value." Since 2009, its Chairman of the Board has been founder Defendant Siebel, who since July 2011 has also served as the Company's Chief Executive Officer ("CEO").

3.    Throughout the Relevant Period, amid speculation pertaining to Defendant Siebel's health, the Individual Defendants provided investors material information relating to the Company's ability to function profitably and maintain its growth projections despite the poor health of CEO and Chairman Defendant Siebel. Rather than acknowledge that his poor health and/or the accommodations requisite for his continued involvement in C3 could impair the Company's ability to execute and capitalize on its growth strategy and potential, the Individual Defendants chose to obscure such disquieting news. Instead, they represented to investors that there were in fact no such problems.

4.    However, reality provided far less reason for such optimism. As Defendant Siebel worked to deal with health issues including vision impairment and repeat hospitalization, his effectiveness as a leader was significantly diminished. This had a negative impact on the Company's ability to perform, given its heavy reliance on Defendant Siebel as its Chairman, CEO and founder.

5.    On August 8, 2025, the truth began to emerge when C3 announced disappointing preliminary financial results for the first quarter of Fiscal Year 2026[1] and reduced its revenue guidance for the full Fiscal Year 2026. The Company attributed the

---

[1] C3's fiscal year starts on May 1 of each year, and ends on April 30. Thus, for the period of time between May 1, 2024 and April 30, 2025, "Fiscal Year 2025."
For the period of time between May 1, 2025 and April 30, 2026, "Fiscal Year 2026."

Verified Shareholder Derivative Complaint

poor results it achieved and the lowered guidance that accompanied those results to its "reorganization with new leadership," and finally admitted that the Company's performance was harmed by the impaired health of Defendant Siebel.

6.    On this news, the price per share of C3's common stock fell by $5.66, or approximately 25.6%, from a close of $22.13 on August 8, 2025, to close at $16.47 on August 11, 2025.

7.    Less than two weeks later, on August 22, 2025, the truth fully emerged regarding he negative impact of the poor results and revelation of the impact of Defendant Siebel's health upon Company performance when a securities class action was filed against the Company, Defendant Siebel, and Defendant Lath in the Northern District of California, captioned *Ligget Sr. v. C3.ai, Inc. et al*, Case No. 3:25CV07129 (N.D. Cal.) (the "Securities Class Action").

8.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make materially false and/or misleading statements that failed to disclose, *inter alia*, that: (1) Defendant Siebel was in poor health and this was negatively impacting the Company's ability to close deals; (2) Company management was unable to effectively minimize that negative impact; (3) C3 could not execute upon its profit and growth projections as a result; and (4) due to the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

9.    Moreover, six of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, reaping combined personal proceeds of ***approximately $85.1 million dollars***.

10.     In light of the Individual Defendants' misconduct—which has subjected the Company and its CEO and Chief Financial Officer ("CFO") to potential liability in the Securities Class Action, and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the liability of Defendants Siebel and Lath in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.    Venue is proper in this District because C3's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiff**

18.    Plaintiff is a current shareholders of C3. Plaintiff has continuously held C3 common stock since first purchasing shares on December 14, 2020.

**Nominal Defendant C3**

19.    C3 is a Delaware corporation with its headquarters at 1400 Seaport Boulevard, Redwood City, California 94063. C3's common stock trades on The New York Stock Exchange ("NYSE") under the ticker symbol "AI."

**Defendant Siebel**

20.    Defendant Siebel is the founder of C3, and has served as the Company's Board Chairman and CEO since 2009. According to the Schedule 14A the Company filed with the SEC on August 21, 2025 (the "2025 Proxy Statement"), as of August 4, 2025, Defendant Siebel beneficially owned 28,535,827 shares of C3 Class A Common Stock, and 3,072,820 shares of C3 Class B Common Stock, giving Defendant Siebel 51.4% of total voting power. Thus, Defendant Siebel is a controlling shareholder.

21.    During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Siebel made the following sales of Company common stock:

| Date | Number of Shares | Proceeds | Avg. Price/Share |
|---|---|---|---|

| March 14, 2025 | 294,116 | $6,323,494 | $21.50 |
| March 17, 2025 | 216,974 | $4,747,391 | $21.88 |
| March 18, 2025 | 127,991 | $2,794,380 | $22.04 |
| April 14, 2025 | 373,169 | $7,534,097 | $20.46 |
| April 15, 2025 | 238,929 | $4,759,466 | $19.92 |
| April 16, 2025 | 14,201 | $276,493 | $19.47 |
| May 2, 2025 | 27,010 | $601,634 | $22.27 |
| May 13, 2025 | 341,698 | $8,200,752 | $24.00 |
| May 14, 2025 | 272,079 | $6,527,175 | $23.99 |
| June 2, 2025 | 17,000 | $447,100 | $26.30 |
| June 11, 2025 | 601,498 | $15,051,342 | $25.39 |
| July 18, 2025 | 589,468 | $16,844,450 | $28.90 |
| August 4, 2025 | 336,000 | $7,650,720 | $22.77 |

Thus, in total, before the fraud was exposed, Defendant Siebel sold 3,450,133 shares of Company stock on inside information, for which he received approximately $81.8 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

22.    The 2025 Proxy Statement stated the following about Defendant Siebel, in relevant part:

Mr. Siebel is the founder of our Company and has served as the Chairman of our board of directors since January 2009, and as our Chief Executive Officer since July 2011. Prior to founding our company, Mr. Siebel founded and served as the Chief Executive Officer of Siebel Systems, a global CRM

software company. Siebel Systems merged with Oracle Corporation in January 2006. Mr. Siebel served in various leadership positions with Oracle Corporation from January 1984 to September 1990. Mr. Siebel currently serves as a member of the College of Engineering boards at the University of Illinois at Urbana-Champaign and the University of California, Berkeley. He was elected a member of the American Academy of Arts and Sciences in April 2013. Mr. Siebel holds a B.A. in History, an M.B.A., and an M.S. in Computer Science, each from the University of Illinois at Urbana-Champaign. He is the author of four books, including most recently the best-selling Digital Transformation: Survive and Thrive in an Era of Mass Extinction (Rosetta Books, 2019).

**Defendant Lath**

23.    Defendant Lath has served as the Company's Senior Vice President and CFO since February 2024. Defendant Lath previously served as the Vice President and Chief Accounting Officer from December 2023 until February 2024.

24.    During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Lath made the following sales of Company common stock:

| Date | Number of Shares | Proceeds | Avg. Price/Share |
|---|---|---|---|
| March 15, 2025 | 4,289 | $92,685 | $21.61 |
| May 29, 2025 | 4,368 | $128,652 | $28.16 |
| June 16, 2025 | 6,040 | $146,108 | $24.19 |
| June 27, 2025 | 17,689 | $441,604 | $24.97 |

Thus, in total, before the fraud was exposed, Defendant Lath sold 32,386 shares of Company stock on inside information, for which he received approximately $809,049 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

25.    The Executive Management page of the Company's Investor Relations

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

website[2] states the following about Defendant Lath:

> Prior to his appointment as Chief Financial Officer, Mr. Hitesh Lath served as the C3 AI's Vice President and Chief Accounting Officer from December 2023 to February 2024.
>
> Before joining C3 AI, Mr. Lath spent over 22 years with EY and was most recently a partner in their San Jose, CA office. At EY, he served several technology clients ranging from Fortune 100 companies to Silicon Valley startups.
>
> Mr. Lath holds a Bachelor of Commerce degree from Shri Ram College of Commerce, Delhi University and Master of Business Administration from The Wharton School of the University of Pennsylvania. He is a Certified Public Accountant in the State of California.

**Defendant Davis**

26.    Defendant Davis has served as a Company director since December 2021, and additionally serves as a member of the Audit Committee.

27.    The Schedule 14A the Company filed with the SEC on August 22, 2024 (the "2024 Proxy Statement") states the following about Defendant Davis, in relevant part:

> *Lisa A. Davis.* Ms. Davis has served as a member of our board of directors since December 2021. Since May 2017, Ms. Davis has served on the board of directors of Penske Automotive Group, Inc. an international transportation services company. Since March 2020 she has also served on the board of directors of Air Products and Chemicals, Inc., an international industrial gasses product and project company. Ms. Davis also serves on the board of directors of Phillips 66, an international downstream oil and gas company, having joined in October 2020. From November 2019 to June 2022, Ms. Davis served on the board of directors of Kosmos Energy Ltd., an international energy and petroleum company. From August 2014 to February 2020, Ms. Davis was a member of the managing board of Siemens AG with responsibility as Chief Executive Officer for Siemens Gas and Power and, from 2017, as a member of the board of directors of Siemens Gamesa Renewable Energy SA. Prior to joining Siemens AG, Ms. Davis served as an Executive Vice President of Downstream Strategy, Portfolio and Alternate Energy for Royal Dutch Shell PLC. From 2000 to 2012, she served in various

---

[2] https://ir.c3.ai/corporate-governance/executive-management.

Verified Shareholder Derivative Complaint

capacities for Royal Dutch Shell PLC including Refining Operations, Supply and Trading, and Lubricants and Bulk Fuels Sales and Marketing. From 2015 to 2016, Ms. Davis served on the board of directors of Spectris PLC, an industrial productivity enhancement products company. Ms. Davis holds a B.S., with honors, in Chemical Engineering from the University of California, Berkeley.

We believe Ms. Davis is qualified to serve as a member of our board of directors because of her significant executive and management experience in the energy industry and her service on the boards of directors of various public companies.

**Defendant Goldman**

28.    Defendant Goldman has served as a Company director since October 2024 and additionally serves as a member of the Audit Committee.

29.    The 2025 Proxy Statement stated the following about Defendant Goldman, in relevant part:

Mr. Goldman has served as a member of our board of directors since May 2025. Mr. Goldman served as the President of Hillspire LLC, a family office management company from September 2017 until April 2022. From October 2012 to June 2017, Mr. Goldman served as the Chief Financial Officer of Yahoo! Inc., a provider of internet content and services. From 2007 to 2012, Mr. Goldman was the Senior Vice President and Chief Financial Officer of Fortinet, Inc., a provider of threat management technologies. He has served as a member of the Public Company Accounting Oversight Board's (PCAOB) Investor Advisory Group since February 2024, and previously served a term as a member of the PCAOB Standing Advisory Group from January 2015 to December 2017. From July 2018 to July 2022, Mr. Goldman served as a member of the Value Reporting Foundation Board (formerly known as the Sustainability Accounting Standards Board (SASB) Foundation), an independent nonprofit responsible for the funding and oversight of SASB. He currently serves on the boards of directors of Fortinet, Inc. and RingCentral, Inc., and previously served on the boards of directors of GoPro, Inc. and Zuora, Inc. In addition, he is a Trustee Emeritus of Cornell University. Mr. Goldman holds a B.S. in Electrical Engineering from Cornell University and an M.B.A. from Harvard Business School.

**Defendant Hyten**

30.    Defendant Hyten has served as a Company director since October 2024, and before that, previously served as an advisor to the Company from May 2022 until October 2024.

31.    During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Hyten made the following sales of Company common stock:

| Date | Number of Shares | Proceeds | Avg. Price/Share |
|------|------------------|----------|------------------|
| June 13, 2025 | 10,000 | $237,500 | $23.75 |

Thus, in total, before the fraud was exposed, Defendant Hyten sold 10,000 shares of Company stock on inside information, for which he received approximately $237,500 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

32.    The 2025 Proxy stated the following about Defendant Hyten, in relevant part:

Gen. Hyten has served as a member of our board of directors since October 2024, and served as an advisor to the Company from May 2022 to October 2024. Gen. Hyten served as the 11th Vice Chairman of the Joint Chiefs of Staff, retiring in November 2021, after a distinguished 40-year career in the United States Air Force. In this role, he served as the nation's second highest ranking military officer. Gen. Hyten previously led Air Force Space Command from 2014 to 2016 and U.S. Strategic Command from 2016 to 2019. Among many other assignments, he was deployed to Southwest Asia as the Director of Space Forces for operations Enduring Freedom and Iraqi Freedom. He attended Harvard University on an Air Force Reserve Officers Training Corps scholarship, graduating with a bachelor's degree in engineering and applied sciences. Gen. Hyten also holds his MBA from Auburn University at Montgomery and is a distinguished graduate from Squadron Officer School as well as Air Command and Staff College. He was also a National Defense Fellow at the University of Illinois.

**Defendant Levin**

33.    Defendant Levin has served as a Company director since 2010 and serves

additionally as a member of the Audit Committee.

34.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Levin made the following sales of Company common stock:

| Date | Number of Shares | Proceeds | Avg. Price/Share |
|------|-----------------|----------|------------------|
| May 29, 2025 | 36,000 | $1,014,120 | $28.17 |
| June 2, 2025 | 6,000 | $2157,860 | $26.31 |

Thus, in total, before the fraud was exposed, Defendant Levin sold 42,000 shares of Company stock on inside information, for which he received approximately $1.2 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

35.     The 2025 Proxy stated the following about Defendant Levin:

Dr. Levin has served as a member of our board of directors since August 2010. Since June 2017, Dr. Levin has served as a Senior Advisor to Coursera Inc., an online learning platform company, for which Dr. Levin served as the Chief Executive Officer from April 2014 until June 2017. Prior to his roles at Coursera, Dr. Levin served as President of Yale University from July 1993 to June 2013. Dr. Levin served as a director of American Express Co. from January 2007 to May 2019. He is currently a Fellow of the American Academy of Arts and Sciences and the American Philosophical Society and is a former trustee of The William and Flora Hewlett Foundation. He also served as an advisor on President Obama's Council of Advisors on Science and Technology. Dr. Levin holds a B.A. in History from Stanford University, a B.Litt. in Politics from Oxford University, and a Ph.D. in Economics from Yale University.

**Defendant McCaffery**

36.     Defendant McCaffery has served as a Company director since March 2009, and serves additionally as the Chair of the Audit Committee, a member of the Nominating and Corporate Governance Committee, and as the Lead Independent Director.

37.    The 2025 Proxy Statement stated the following about Defendant McCaffery, in relevant part:

> Mr. McCaffery has served as a member of our board of directors since March 2009. Since December 2005, Mr. McCaffery has served as the Managing Director for Makena Capital Management, LLC, an investment management firm, and was Chief Executive Officer of Makena Capital Management, LLC from December 2005 to January 2013. He served on the board of directors for NVIDIA Corporation from February 2015 to June 2024. Mr. McCaffery holds a B.A. from the Woodrow Wilson School of Public and International Affairs at Princeton University, a B.A. Honours and an M.A. in Politics, Philosophy and Economics from Merton College at Oxford University as a Rhodes Scholar, and an M.B.A. from the Stanford Graduate School of Business. Mr. McCaffery has served as a member of our board of directors since March 2009. Since December 2005, Mr. McCaffery has served as the Managing Director for Makena Capital Management, LLC, an investment management firm, and was Chief Executive Officer of Makena Capital Management, LLC from December 2005 to January 2013. He served on the board of directors for NVIDIA Corporation from February 2015 to June 2024. Mr. McCaffery holds a B.A. from the Woodrow Wilson School of Public and International Affairs at Princeton University, a B.A. Honours and an M.A. in Politics, Philosophy and Economics from Merton College at Oxford University as a Rhodes Scholar, and an M.B.A. from the Stanford Graduate School of Business.

**Defendant Murray**

38.    Defendant Murray has served as a Company director since May 2024.

39.    The 2025 Proxy stated the following about Defendant Murray, in relevant part:

> Mr. Murray has served as a member of our board of directors since May 2024. Mr. Murray served as the Chief Executive Office of Fortune Media from December 2018 to April 2024. He served as the Chief Content Officer of Time from August 2016 to December 2017, and an Editor at Fortune Magazine from August 2014 to August 2016. Prior to his roles at Fortune and Time, Mr. Murray served as President of Pew Research Center from January 2013 to July 2014. He also served as a board member of AARP from September 2022 to December 2024. Mr. Murray holds a B.A. in English Literature from the University of North Carolina at Chapel Hill and an M.Sc. in economics from the London School of Economics. Mr. Murray has served as a member of our board of directors since May 2024. Mr. Murray served as the Chief Executive

Office of Fortune Media from December 2018 to April 2024. He served as the Chief Content Officer of Time from August 2016 to December 2017, and an Editor at Fortune Magazine from August 2014 to August 2016. Prior to his roles at Fortune and Time, Mr. Murray served as President of Pew Research Center from January 2013 to July 2014. He also served as a board member of AARP from September 2022 to December 2024. Mr. Murray holds a B.A. in English Literature from the University of North Carolina at Chapel Hill and an M.Sc. in economics from the London School of Economics.

**Defendant Rice**

40.　　Defendant Rice has served as a Company director since October 2024.

41.　　The 2025 Proxy Statement stated the following about Defendant Rice, in relevant part:

Dr. Rice has served as a member of our board of directors since December 2009. Since September 2020, Dr. Rice has served as the Tad and Dianne Taube Director of the Hoover Institution at Stanford University. In addition, Dr. Rice has served as the Denning Professor of Global Business and the Economy for the Stanford Graduate School of Business since September 2010. Since March 2009, Dr. Rice has served as the Thomas and Barbara Stephenson Senior Fellow of Public Policy for the Hoover Institution at Stanford University and as a Professor of Political Science for Stanford University. Dr. Rice has also served as a partner at Rice, Hadley, Gates & Manuel LLC, an international strategic consulting firm that Dr. Rice founded, since November 2009. From January 2005 to January 2009, Dr. Rice served as the Secretary of State of the United States of America, and from January 2001 to January 2005, Dr. Rice served as Chief National Security Advisor to President George W. Bush. Dr. Rice currently serves on the board of directors of Makena Capital Management, LLC, a private endowment firm. From April 2014 to May 2021, Dr. Rice served on the board of directors of Dropbox, Inc., a cloud-based file sharing company. Dr. Rice holds a Ph.D. in Political Science from the University of Denver, an M.A. in Political Science from the University of Notre Dame, and a B.A. in Political Science from the University of Denver.

**Defendant Sewell**

42.　　Defendant Sewell has served as a Company director since 2017 and additionally serves as a member of the Compensation Committee and as the Chair of the Nominating and Corporate Governance Committee.

43.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Sewell made the following sales of Company common stock:

| Date | Number of Shares | Proceeds | Avg. Price/Share |
|---|---|---|---|
| June 11, 2025 | 79 | $2,054 | $26.00 |

Thus, in total, before the fraud was exposed, Defendant Sewell sold 79 shares of Company stock on inside information, for which he received approximately $2,054 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

44.     The 2025 Proxy stated the following about Defendant Sewell, in relevant part:

Mr. Sewell has served as a member of our board of directors since May 2017. Mr. Sewell served as the Senior Vice President, General Counsel and Secretary of Apple Inc., a technology company, from September 2009 to December 2017. From October 1996 to September 2009, Mr. Sewell served in various leadership positions with Intel Corporation, including as Senior Vice President, General Counsel from September 2002 to September 2009. Since January 2013, Mr. Sewell has served on the board of directors for Vail Resorts, Inc., a mountain resort company. Mr. Sewell holds a B.S. from Lancaster University (U.K.) and a J.D. from The George Washington University Law School.

**Defendant Snabe**

45.     Defendant Snabe has served as a Company director since February 2021, and additionally has served as a special advisor to the Company's CEO since February 2025. Previously, Defendant Snabe served as a special advisor to the CEO from September 2020 to February 2021.

46.     The 2025 Proxy Statement stated the following about Defendant Snabe, in relevant part:

Mr. Snabe has served as a member of our board of directors since February 2021, has served as a special advisor to our Chief Executive Officer since

February 2025, and previously served as a special advisor to our Chief Executive Officer from September 2020 to February 2021. Mr. Snabe served as Co-Chief Executive Officer of SAP AG, a technology company, from February 2010 to May 2014, and as a member of the SAP AG supervisory board from May 2014 to May 2018. Mr. Snabe currently serves as Chairman of the Supervisory Board of Siemens AG, an industrial technology company. He also has served on the board of directors of Temasek Holdings since January 2025, and joined the board of directors of Bloom Energy Corporation in August 2025. Mr. Snabe served as Vice Chairman of the Supervisory Board of Allianz SE, an insurance and financial asset management company, from 2014 to May 2022, and Chairman of the Board of A.P. Møller – Mærsk A/S, a shipping and transportation company, from 2014 to March 2022. Mr. Snabe currently serves as a member of the Board of Trustees of the World Economic Forum, a non-profit organization.

**Defendant Sridhar**

47.     Defendant Sridhar has served as a Company director since February 2023, and additionally serves as a member of the Compensation Committee.

48.     The 2025 Proxy Statement states the following about Defendant Sridhar, in relevant part:

Dr. Sridhar has served as a member of our board of directors since February 2023. Dr. Sridhar is the Founder, Chairman, and Chief Executive Officer of Bloom Energy Corporation since 2002. Prior to founding Bloom Energy Corporation, he was Director of the Space Technologies Laboratory (STL) at the University of Arizona where he was also a Professor of Aerospace and Mechanical Engineering. Dr. Sridhar has served as an advisor to the National Aeronautics and Space Administration and has led major consortia of industry, academia, and national labs. He also serves as a Strategic Limited Partner at Kleiner Perkins, a venture capital firm, and as a special advisor to New Enterprise Associates. Dr. Sridhar holds a bachelor's degree in mechanical engineering with honors from the University of Madras, India (now called NIT, Trichy), a master's degree in nuclear engineering and a PhD in Mechanical Engineering from the University of Illinois at Urbana-Champaign.

**Defendant Ward**

49.     Defendant Ward has served as a Company director since January 2009, and additionally serves as a member of the Nominating and Corporate Governance Committee

and Chair of the Compensation Committee.

50.    During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Ward made the following sales of Company common stock:

| Date | Number of Shares | Proceeds | Avg. Price/Share |
|---|---|---|---|
| May 29, 2025 | 42,382 | $1,115,494 | $26.32 |

Thus, in total, before the fraud was exposed, Defendant Ward sold 42,382 shares of Company stock on inside information, for which he received approximately $1.1 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

51.    The 2025 Proxy stated the following about Defendant Ward, in relevant part:

Mr. Ward has served as a member of our board of directors since January 2009. Mr. Ward served as the Chief Executive Officer for Lenovo Group Limited, the international personal computer company formed by the acquisition of IBM's personal computer division by Lenovo, from April 2005 to January 2006. Prior to that acquisition, Mr. Ward held a number of management positions with IBM from September 1978 to April 2005, including Senior Vice President and General Manager of the Personal Systems and Retail Systems Group from March 2003 to April 2005, General Manager of the Industrial Sector from February 2000 to March 2003, General Manager of the ThinkPad and Mobile division from January 1996 to March 1998 and Chief Information Officer from March 1998 to February 2000. Mr. Ward has served on the board of directors of Carpenter Technology Corporation, a specialty metals company, since March 2001, and currently serves as Lead Independent Director. He also has served on the board of directors of Molekule, an air purification, monitoring equipment and software company, since November 2022, and served on the board of directors of Sprinklr, Inc., a software company, since January 2025. From July 2021 until its sale to LM Ericsson Telephone Company in July 2022, Mr. Ward served as a member of the board of directors of Vonage Holdings Corp., an internet communications company. From December 2014 until its sale to The Boeing Company in October 2018, Mr. Ward served as a member the board of

directors of KLX Inc., an aerospace solutions and supply chain company, and from September 2018 to June 2021, he served as a member of the board of directors of KLX Energy Services Holdings, Inc., an oilfield services company spun out from KLX Inc. Mr. Ward also previously served as a member of the board of directors of E2Open, a supply chain SAS company he co-founded, from January 2001 to March 2015, E-Ink Corporation, a maker of electronic paper displays, from December 2006 to December 2009 and QD Vision, Inc., a nanomaterials product company, from June 2014 until its sale to Samsung in November 2016. Mr. Ward holds a B.S. in Mechanical Engineering from California Polytechnic State University, San Luis Obispo.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

52.    By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of C3 and because of their ability to control the business and corporate affairs of C3, the Individual Defendants owed C3 and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage C3 in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of C3 and its shareholders so as to benefit all shareholders equally.

53.    Each controlling shareholder, director, and officer of the Company owes to C3 and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

54.    The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of C3, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

55.    To discharge their duties, the controlling shareholder, officers, and directors of C3 were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

56.    Each Individual Defendant, by virtue of their position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the

highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of C3, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

57.    As controlling shareholder, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

58.    To discharge their duties, the controlling shareholder, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of C3 were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to C3's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how C3 conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of C3 and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that C3's operations would comply with all applicable laws and C3's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

59.    Each of the Individual Defendants further owed to C3 and the shareholders the duty of loyalty requiring that each favor C3's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

60.    At all times relevant hereto, the Individual Defendants were the agents of each other and of C3 and were at all times acting within the course and scope of such agency.

61.    Because of their advisory, executive, managerial, directorial, and controlling positions with C3, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

62.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by C3.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

63.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

64.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

65.    The Individual Defendants accomplished their conspiracy, common

enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of C3 was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

66.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

67.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of C3 and was at all times acting within the course and scope of such agency.

## C3'S CODE OF CONDUCT

68.    C3's Code of Business Conduct and Ethics (the "Code of Conduct") implies that all employees of the Company are covered, stating that "[a]ny employee who violates the standards in this Code of Buess Conduct and Ethics . . . may be subject to disciplinary action." The Code of Conduct represents that the Company is "committed to conducting its affairs honestly and ethically," and that it "expect[s] every employee, officer and director to act with integrity, apply good judgment and observe the highest personal ethical standards in making business decisions."

69.    In recognition of this, under Section 1, "Honest and Ethical Conduct," the

Code of Conduct states that it is the Company's policy to "promote high standards of integrity by conducting our affairs in an honest and ethical manner. C3 AI's integrity and reputation depend on the fairness and integrity brought to the job by each person associated with us. Personal integrity and sound judgment are the foundation of C3 AI's corporate integrity."

70.    In the section entitled "Legal Compliance," the Code of Conduct states:

Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. We expect employees, officers and directors to understand the legal and regulatory requirements applicable to their business units and areas of responsibility and to be familiar with and comply with other C3 AI policies relating to legal compliance, including C3 AI's Anti-Corruption Policy and Insider Trading Policy. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as C3 AI, to civil and/or criminal penalties, and may be grounds for disciplinary action, up to and including termination of employment.

71.    The Code of Conduct also addresses the issue of insider trading, in the section "C3 AI's Insider Trading Policy," stating briefly:

Employees, officers and directors who have access to material, non-public (or "inside") information are not permitted to use or share that information for stock trading purposes. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is illegal. Please refer to C3 AI's Insider Trading Policy for more detailed information.

72.    In the section, titled "International Business Laws," the Code of Conduct states:

Our employees, officers and directors are expected to comply with the applicable laws in all countries to which they travel, in which they operate and where we otherwise do business, including laws prohibiting bribery, corruption or the conduct of business with specified individuals, companies or countries. The fact that, in some countries, certain laws are not enforced or that violation of those laws is not subject to public criticism will not be accepted as an excuse for noncompliance. Please also refer to C3 AI's Anti-Corruption Policy

73.    In the section "Conflicts of Interest," the Code of Conduct states:

C3 AI expects its employees, officers and directors to be free from influences that conflict with the best interests of C3 AI or might deprive C3 AI of their undivided loyalty in business dealings. Making judgments, taking decisions, or pursuing actions when facing a conflict of interest may make it difficult to perform duties objectively and effectively and may have legal or regulatory consequences. Employees, officers and directors should avoid situations where their personal interests (financial or otherwise) may conflict with or compromise C3 AI's interest, could potentially result in a conflict of interest or could otherwise have the appearance of impropriety.

While it is not possible to list all potential conflicts of interest, some of the more common conflicts would include: (a) outside employment, consulting, or board service; (b) holding a financial or other interest in a customer, vendor or partner ofC3 AI, an entity seeking to do business with us or a competitor; or(c)soliciting or accepting gifts, favors, loans or preferential treatment from any person or entity that does business or seeks to do business with us. Additional detail on each of these potential conflicts of interest—as well as other areas of potential concern—may be found in the C3 AI Employee Handbook.

Employees, officers and directors must disclose any conflicts of interest to the General Counsel as soon as it is identified that there may be a conflict of interest and, wherever possible, before engaging in the conduct in question. If you are unsure whether certain conduct or actions may constitute a conflict of interest or lead to a conflict of interest, you should discuss with the General Counsel.

74.    In the section "Financial Integrity," the Code of Conduct states:

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others. We also rely upon our accounting and other business and corporate records in preparing publicly filed reports. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who contribute in any way in preparing or

verifying these reports should strive to ensure that our financial disclosure is complete, accurate and transparent. If you have any concerns about how to comply with this policy, or if you observe conduct or actions that do not seem to comply with this policy, you should immediately discuss such concerns with the General Counsel.

75.    Regarding waivers, the Code of Conduct states:

Any waiver of this Code for executive officers or directors may be authorized only by our Board of Directors or, to the extent permitted by the rules of any stock exchange on which our capital stock is listed and our Corporate Governance Guidelines, a committee of the Board of Directors and will be disclosed to stockholders as required by applicable laws, rules and regulations

76.    Regarding employee "Questions and Reporting Potential Violations," the Code of Conduct states:

If you are aware of a suspected or actual violation of this Code, you have a responsibility to promptly report it to the General Counsel.

You may report violations of this Code, including concerns regarding C3 AI auditing and accounting matters in one of the following ways:
- via electronic mail to the Company's General Counsel at C3legal@c3.ai;

- online via www.lighthouse-services.com/c3.ai;

- via a third-party hosted telephone hotline at 833-222-4158 in the United States or 800-603- 2869 for all other countries.

- via regular mail to the Company at: 1300 Seaport Blvd, Suite 500, Redwood City, CA 94063; Attn: General Counsel

You may submit a report online or call the toll-free number anonymously if you prefer, but in that case the General Counsel will be unable to obtain follow-up details from you that may be necessary to investigate the matter. Whether you identify yourself or remain anonymous, your contact with the anonymous reporting service will be kept strictly confidential to the extent reasonably possible within the objectives of this Code.

The General Counsel will investigate all reported possible Code violations promptly and with the highest degree of confidentiality that is possible under

the specific circumstances. If any investigation indicates that a violation of this Code has probably occurred, we will take such action as we believe to be appropriate under the circumstances. If we determine that an employee, officer or director is responsible for a Code violation, he or she will be subject to disciplinary action up to, and including, termination and, in appropriate cases, civil action or referral for criminal prosecution

Please note that retaliation against employees reporting violations of this Code is prohibited and we will take prompt disciplinary action against any employee, officer or director who attempts to retaliate against you for reporting violations.

77. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Moreover, six of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting aggregate proceeds of approximately ***$85.1 million***. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## C3'S AUDIT COMMITTEE CHARTER

78. C3 also maintains the "Charter of the Audit Committee of the Board of Directors" (the "Audit Committee Charter"), which governs the Audit Committee's role and responsibilities. The Audit Committee Charter states the following regarding the purpose of the Audit Committee under the heading "Purpose:"

The purpose of the Audit Committee (the "Committee") of the Board of Directors of C3.ai, Inc. (the "Company") is to:

- oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;

- oversee the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");

- maintain and foster an open avenue of communication with the Company's management, and Auditors;

- review any reports or disclosures required by applicable law and stock exchange listing requirements;

- help the Board oversee the Company's legal and regulatory compliance, including risk assessment; and

- provide regular reports and information to the Board.

79.    Under the heading "Authority," the Audit Committee Charter states the following:

The Committee will have access to all Company books, records, facilities and personnel as deemed necessary or appropriate by any member of the Committee. If the Committee concludes that it must retain legal, accounting or other outside advisors, it may do so and determine compensation for those advisors at the Company's expense. The Committee may also pay any ordinary administrative expenses it deems appropriate in carrying out its duties at the expense of the Company. The Committee will have authority to require that any of the Company's personnel or outside advisors attend any meeting of the Committee or meet with any member of the Committee or any of its advisors.

The Chairperson shall have the delegated authority to act on behalf of the Committee in connection with (1) approval of the retention of outside service providers and advisors (including negotiation and execution of their engagement letters), (2) preapproval of audit or non-audit services, (3) approval of payment of expenses incurred by the Committee described in the previous paragraph, and (4) as may otherwise be determined by the

Committee. The Committee also may form and delegate authority to one or more subcommittees consisting of one or more members of the Board (whether or not he, she or they are on the Committee) to the extent allowed under applicable law and stock exchange listing requirements. By delegating an issue to the Chairperson or a subcommittee, the Committee does not surrender any authority over that issue. Although the Committee may act on any issue that has been delegated to the Chairperson or a subcommittee, doing so will not limit or restrict future action by the Chairperson or subcommittee on any matters delegated to it. Any action or decision of the Chairperson or a subcommittee will be presented to the full Committee at its next scheduled meeting. By approving this Charter, the Board delegates authority to the Committee with respect to these responsibilities.

80.    In the section entitled "Responsibilities," the Audit Committee Charter states the following, in relevant part:

The Committee's responsibilities are for oversight, as described under "Purpose" above. The members of the Committee are not employees of the Company, and they do not perform management's or any Auditors' functions. The Committee relies on the expertise and knowledge of management, the internal auditors (if any), and any Auditors in carrying out its oversight responsibilities. Management is responsible for preparing accurate and complete financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"), crafting periodic reports, and establishing and maintaining appropriate accounting principles and financial reporting policies and satisfactory internal control over financial reporting. The Auditors will audit the Company's annual consolidated financial statements and, when required, the effectiveness of the Company's internal control over financial reporting and review the Company's quarterly financial statements. It is not the Committee's responsibility to prepare or certify the Company's financial statements, guarantee the audits or reports of the Auditors, certify as to whether any Auditors are "independent" under applicable law or stock exchange listing requirements, or ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP, or otherwise comply with applicable law or stock exchange listing requirements or the Company's policies.

Following the Public Effective Date, the Committee shall have the following responsibilities, some of which it may assume prior to such date in its discretion; provided, however, that this list of responsibilities is intended to be a guide and to remain flexible to account for changing circumstances

and needs. Accordingly, the Committee may depart from or supplement such responsibilities, and establish policies and procedures, to the extent permitted by applicable law and stock exchange listing requirements.

81.    In the same section, under the subheading "Auditor Management," the Audit Committee Charter lists the following:

**1.    Hiring and Selecting Auditors.** The Committee will evaluate, determine whether to retain, and determine the fees of any Auditors and any other registered public accounting firm engaged for the financial reporting process. In addition, the Committee may replace any existing Auditors or other registered public accounting firm engaged for the financial reporting process with a different public accounting firm.

**2.    Approving Audit and Non-Audit Engagements.** The Committee will review audit plans, the adequacy of staffing, the fees to be paid to Auditors, and oversee the negotiation and execution of any engagement letters on behalf of the Company. The Committee will oversee the rotation of the Auditors' partners on the Company's audit engagement team as required by applicable law and stock exchange listing requirements. The Committee will approve all audit and non-audit related services that the Auditors provide to the Company before the engagement begins, unless applicable law and stock exchange listing requirements allow otherwise. The Committee may establish pre-approval policies and procedures or delegate pre-approval authority to one or more Committee members as permitted by applicable law and stock exchange listing requirements.

**3.    Auditor Independence.** At least annually, to the extent required by applicable laws and stock exchange listing requirements, the Committee will assess the qualifications, performance, and independence of the Auditors, or in the case of prospective Auditors, before they are engaged. That assessment will include reviewing written disclosures from any Auditors regarding any relationships they have that may affect independence, as defined by applicable law and stock exchange listing requirements. The Committee will review as appropriate a written statement from any Auditors affirming their independence, and assess, consider, and discuss with them any potential relationships concerning their objectivity and independence.

**4.    Former Employees of Auditors.** The Committee will oversee the policies and procedures as required by applicable law and stock exchange

listing requirements governing how the Company may employ individuals who are or once were employed by the Auditors.

82.    In the same section, under the subheading "Financial Review and Disclosure," the Audit Committee Charter states the following:

**5.    Annual Audit Results.** The Committee will review with management and the Auditors the results of the Company's annual financial statement audit, including:

- the Auditors' assessment of the quality of the Company's accounting principles and practices;

- the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative GAAP methods on the financial statements);

- all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial);

- the adequacy of the disclosures in the financial statements; and

- any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

**6.    Audited Financial Statement Review; Quarterly and Annual Reports.** The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

**7.    Proxy Report.** After the Public Effective Date, the Committee will oversee the preparation of any report of the Committee required by applicable law or stock exchange listing requirements to be included in the Company's annual proxy statement.

**8.    Accounting Principles and Policies.** The Committee will review and discuss with management and the Auditors significant issues regarding accounting principles and financial-statement presentation, including:

- critical accounting policies and practices

- alternative accounting policies available under GAAP;

- the potential impact on the Company's financial statements of alternative treatments and any off-balance sheet structures; and

- any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies.

The Committee will review with the Auditors and management, if appropriate, any written communication, such as any management letter or internal-control letter, and monitor management's response to such communications. The Committee will discuss with the Auditors the matters required to be discussed by Auditing Standard No. 1301, Communications with Audit Committees, as adopted by the PCAOB (including any successor rule adopted by the PCAOB) on at least an annual basis, to the extent required by such rules.

**9.    Management Cooperation with Audit.** The Committee will evaluate management's cooperation with the Auditors during their audit examination, and expect disclosure of any significant difficulties or disagreements encountered during the audit, if any.

83.    In the same section, under the subheading "Internal Control and Procedures," the Audit Committee Charter states:

**10.    Risk Assessment and Management.** The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security, competition, and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy

and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks. The Committee shall review and approve as appropriate the Company's decision to enter into swaps or other derivative transactions that are exempt from exchange-execution and clearance under "end-user exception" regulations established by the Commodity Futures Trading Commission, and to review and discuss with management the Company's Foreign Exchange Policy, including the Company's use of swaps.

**11.    Internal Control over Financial Reporting; Disclosure Controls.** The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and, to the extent necessary, any remediation plans or special audit steps adopted in light of any material control deficiencies.

**12.    Correspondence with Regulators.** The Committee will consider and review with management, the Auditors, and outside advisors or accountants any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

**13.    Internal Control Report.** At least annually (if required by applicable stock exchange listing requirements) or as may otherwise be determined by the Committee, the Committee will review a report by the Auditors describing its internal quality-control procedures and any material issues raised by (a) that firm's internal quality-control review, (b) any peer review of the firm's internal quality-control procedures or review, or (c) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors.

**14.    Complaint Procedures.** The Committee will oversee procedures for receiving, retaining, and investigating the following:

- complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and

Verified Shareholder Derivative Complaint

- confidential and anonymous submissions by employees concerning questionable accounting or auditing matters. In addition, the Committee will oversee procedures for receiving, retaining, and investigating any "hotline" complaints or submissions delegated to the Committee by the Board.

**15.    Ethical Compliance.** The Committee will review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure compliance with applicable laws and stock exchange listing requirements, including the Company's Code of Business Conduct and Ethics (the "Code").

**16.    Related Party Transactions.** The Committee will review and approve, in accordance with the Company's policies, any related party transaction as defined by applicable law or stock exchange listing requirements or as provided under the Code.

84.    In the same section, under the subheading "Other Matters," the Audit Committee Charter States the following:

**17.    Committee Self-Assessment.** The Committee will regularly evaluate its performance and the adequacy of this Charter.

**18.    Other Legal and Finance Matters.** The Committee will review with management legal and regulatory compliance and any actual, pending or threatened legal or financial matters that could significantly affect the Company's business or financial statements or as otherwise deemed appropriate by the Committee

85.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and

diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## FALSE AND MISLEADING STATEMENTS

### Background

86.    C3 is a Delaware corporation headquartered in Redwood City, CA, that trades as "AI" on the NYSE. C3 defines itself as an "Enterprise AI application software company" whose main products are: (1) C3 Agentic AI Platform, an "end-to-end platform for developing, deploying, and operating Enterprise AI applications;" (2) C3 AI Applications, a "portfolio of industry-specific Enterprise AI applications;" and (3) C3 Generative AI, a "library of agentic AI applications to retrieve data, analyze information, surface insights, and orchestrate workflows to drive business value."

87.    C3 boasts that the C3 Agentic AI Platform and C3 AI Applications "enable organizations to simplify and accelerate Enterprise AI application development, deployment, and administration." The Company aims to provide a software platform that enables quick development of AI applications for companies that would normally lack the programming sophistication and capability to do so.

88.    Since 2009, its Chairman of the Board has been founder Defendant Siebel, who since July 2011 has also served as the Company's CEO.

89.    The Company claims that its growth strategy is predicated upon the expansion of its "direct enterprise sales and service organization" geographically and across vertical markets to both attract new customers and expand usage by existing customers. This is accomplished in turn, the Company represents, by the fact that its customers "frequently identify incremental opportunities within their operations and expand their use of [C3's] products."

### False and/or Misleading Statements

#### February 26, 2025 Earnings Call

90.    On February 26, 2025, the Company held an earnings call to discuss its

financial results for the third quarter of Fiscal Year 2025 (the "Q3 2025 Earnings Call").

91.    During the Q3 2025 Earnings Call Defendant Siebel addressed recent concerns pertaining to his health and assured investors that he was fit to fully and ably perform his role. Specifically, Defendant Siebel engaged in the following conversation, in relevant part:

> <Q: Patrick D. Walravens – Citizens JMP Securities, LLC – MD, Director of Technology Research, and Equity Research Analyst> Tom, would you be okay talking about the note that you published on February 18? So sorry, but if you could just talk about what the health setback was and what steps you're taking in terms of running the business, I think that would be great.

> <Defendant Siebel> . . . Now as it relates to operating the business, it has so -- Tom has to learn some new skills, and we put the accommodations in place. I mean, you know me to be intimately familiar with the details of this business, okay? And you can imagine that we spent exacting detail with this management team on how we were reorganizing this company around this new opportunity that's here.

> ***We've done the same -- we have the same meeting with all of our salespeople around from the world. I spent a lot of time personally with all of the -- a lot of time personally, okay, with all of the partners that we've discussed. I put the accommodations in place for -- about really the only thing I can't do is read e-mail. So the -- so we put the [ compensation ] in place, there is somebody here with a hot computer, who reads the e-mails to me. I comment, I respond, I approve, I don't prove, what have you. I am here in the office. I am managing the business every day.***

> In the short term, my travel, the medical community has me on kind of -- they don't want me going real far or a high altitude. ***And so we've made arrangements for Jim Snabe, who you most certainly know or know of and one of our more distinguished directors.***

> Jim, of course, was the Co-CEO of SAP, Chairman of Maersk, Chairman of Allianz, Chairman of [ Siemens ]. And so Jim assumed the role as a special assistant to the Chief Executive, okay? And he's filling in for the events that Tom can't do. Let's say, I was supposed to be at VivaTech at Paris or what have you or maybe we need to do an executive customer review at Shell in London.

And so this is how it's organized. ***I am fully engaged, managing every details of the business every day, as you know me a little bit and you know I'm generally in touch with those details. My health is excellent, okay?*** So beyond all of the infirmities that I had, I just can't see.[3]

***May 28, 2025 Earnings Call***

92.　On May 28, 2025, the Company held an earnings call to discuss its financial results for the fourth quarter and full Fiscal Year 2025 (the "Q4 2025 Earnings Call").

93.　During the Q4 2025 Earnings Call, Defendant Siebel discussed current market demand and, in that context, the Company's growth potential. During the Q4 2025 Earnings Call, Defendant Siebel stated, in relevant part:

> Now let's look at where we are, the facts of the market in -- I'm sorry, May of 2025, okay? ***We have a generally acknowledged, large and rapidly growing market.*** And we look at the AI stack and the companies that are playing at the bottom of the stack. We have the silicon providers, the Intels, the AMDs, the NVIDIAs. Above that, we have the infrastructure providers, the Microsoft Azure, AWS, GCP, et cetera. On top of that, we have the people providing the foundation models like OpenAI and Anthropic, Facebook, et cetera. On top of that, we have the providers of many thousands of utilities that are out there that do things like platform independent, relational database persistence or key value stores or AutoML or virtualization or whatever it may be.
>
> * * *
>
> The result of this, we've experienced -- as a result of the kind of realization of this enterprise AI kind of reality, ***we've seen enormous growth in our market***, again, in the last few years, going from 6% to 16% to 25%. ***And our focus, if we look at Q3 and Q4 of fiscal year '25 has been building an ecosystem to be able to address this huge sucking sound that we hear out there, that is the demand for enterprise AI applications***. And in order to address these applications, we need an army of partners. And so ***we have been focused in the last few quarters on establishing this army of strategic partners and enabling this army of strategic partners to be effective at communicating the benefits of these applications and selling these applications***.

---

[3] All emphasis herein is added unless otherwise specified.

* * *

[O]ur revenue growth rate continues to exceed our expense growth rate. Fast math without the Excel spreadsheet. ***It follows ipso facto, the cash possibility and non-GAAP profitability is simply a matter of scale.*** And I expect in 2027 and beyond, we will cross that path into consistent cash positivity and an annualized non-GAAP profitability thereafter. So it was a great quarter, a great year. Customers are happy, products are excellent, market is huge. And if there is anybody else in the Enterprise AI applications business, I'm unaware of who they are.

94.    During the Q4 2025 Earnings Call, C3's Agentic AI division concurred with Defendant Siebel, stating, in relevant part:

And finally, we expect to see accelerating growth driven by the Generative AI and Agentic AI markets where our solutions are highly differentiated, highly beneficial and address a market opportunity that is incalculably large. The Enterprise AI landscape is at an inflection point and C3 AI stands ready to lead. The convergence of market demand and our proven capabilities creates a unique opportunity to drive sustained growth by combining best-in-class technology with a world-class network of partners and a relentless focus on customer value, we are poised to shape the future of business operations across industries. As we step into fiscal 2026, our path is clear. Our momentum is strong, and our commitment to delivering impactful AI solutions has never been greater.

95.    Defendant Lath also spoke during the prepared remarks portion of the Q4 2025 Earnings Call, discussing the Company's guidance for the first quarter and entirety of Fiscal Year 2026. At this time, Defendant Lath stated, in relevant part:

Now I'll move on to our guidance for the next quarter. ***Our revenue guidance for Q1 of fiscal '26 is $100 million to $109 million. For the full fiscal 2026, we are anticipating revenue in the range of $447.5 million to $484.5 million. Our guidance for non-GAAP loss from operations for the first quarter is $23.5 million to $33.5 million. And our non-GAAP loss from operations for the year, the guidance is $65 million to $100 million.*** Our guidance is predicated on the assumption of geopolitical stability. Were there to be a situation that the U.S. government closed, the budget did not pass, or we see indications of global trade friction, given the reality of these market risks, those could have unknown and adverse consequences on our business results.

Last year, our revenue growth was 25% and our expenses grew by 18%. ***As we approach fiscal '26, we expect the revenue growth rate to continue to exceed our expense growth rate. So profitability remains simply a matter of scale***. Our expectation is that we will cross into non-GAAP profitability during the second half of fiscal '27, and we expect to be free cash flow positive in the fourth quarter of fiscal '26 and in successive years thereafter.

96.    During the question-and-answer ("Q&A") portion of the Q4 2025 Earnings Call, Defendant Siebel again discussed his health, emphasizing that it was improving and defending the wider-than-typical full year guidance range given by Company management, in relevant part:

<Q: Patrick D. Walravens – Citizens JMP Securities, LLC – MD, Director of Technology Research, and Equity Research Analyst> Wonderful. And then if I could ask a follow-up. With your permission, Tom, I hope this is okay. But in February, you informed us that you'd suffered a health setback and it was limiting your ability to travel and then you're going to have Jim Snabe help out, but I was delighted to hear on this call that you're -- I mean, you're probably not delighted to get out of red eye, but I was delighted to hear that you're getting on a red eye because that sounds like some positive development. So I don't know, any comments that you're okay sharing with us on that, I'm sure, would be greatly appreciated.

<Defendant Siebel> ***I did get slowed down for a little bit. There's no question about it.*** And I had -- it's very unlikely to work from home. You know that. And ***I had to work from home for a little while and take it easy and recover***, but I will catch a red eye to Washington, D.C. tonight. I will be in Washington, D.C. again for 3 days, I think, 10 days from now after attending a wedding in Cabo. ***So just when you thought it was safe, Pat, I'm back.***

\* \* \*

<Q: Matthew Ryan Calitri – Needham & Company, LLC – Research Analyst> . . . looking at your FY '26 revenue guidance, the band of outcomes is considerably larger than what you've given in past quarters. How did you think through guidance construction this quarter? And what needs to happen to achieve the high end of that band versus the low end?

<Defendant Siebel> Well, we read the same newspaper that you guys read. And we do talk to the President, and I had dinner with the speaker of the house

1
2
3
4
5
6
7
8
9

last night. I spoke with the leader of the Senate last week, and I'll meet -- and so we do know these people and we do read the newspaper. And we all know there is risk. There is risk in Europe. We have kinetic risk. We have geopolitical risk. We have risk -- we have budget risk of, in fact, the government even shutting down. And these are real. And we have companies out there that were withdrawing guidance altogether. And we thought in the interest of being -- we have to acknowledge that these risks are real. And so that results -- as a result, we have a broader range than usual to accommodate the unanticipated. And when we deal with these guys who are making America great again, they seem to hit us with the unanticipated quite frequently. So that's it. We're just acknowledging very real risk -- market risk that's out there. And should it go bad, it's going to have an adverse effect on our business as it will, General Motors and everybody else in the world.

10

***July 24, 2025 Press Release***

11
12

97.    On July 24, 2025, C3 issued a press release announcing that it had "initiated a search for Mr. Siebel's successor as Chief Executive Officer of C3 AI."

13
14
15
16

98.    In the press release, Defendant Siebel was quoted discussing his departure and attempting to assuage nervous investors that he would continue to be fully engaged in his role as CEO until such time as a successor was chosen. Specifically, Defendant Siebel stated, in relevant part:

17
18
19
20
21

After being diagnosed with an autoimmune disease in early 2025, I have experienced significant visual impairment . . . ***I will remain fully engaged as Chief Executive Officer of C3.ai*** until such time as the C3.ai board appoints my successor after which I will continue in the role of Executive Chairman focusing on strategy, product innovation, strategic partner and customer relationships."

22
23
24
25
26
27
28

99.    The statements referenced in ¶¶ 90-98 were materially false and/or misleading when made. Defendants created the false impression that they possessed reliable and accurate information pertaining to the Company's revenue and growth projections while simultaneously minimizing investor concerns related to Defendant Siegel's ongoing health problems. Specifically, the statements concealed and/or failed to disclose, *inter alia*, that: (1) Defendant Siebel was in poor health and this was negatively impacting the Company's ability to close deals; (2) Company management was unable to effectively minimize that

1
2
3

negative impact; (3) C3 could not execute upon its profit and growth projections as a result; and (4) because of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

4
5

### **The Truth Begins to Emerge as False and Misleading Statements Continue**

6

***August 8, 2025 Press Releases***

7
8

100.  On August 8, 2025, the Company issued a press release announcing the Company's preliminary financial results for the first quarter of Fiscal Year 2026 (the "Q1 2026 Press Release"). The Q1 2026 Press Release stated, in relevant part:

9
10
11
12
13
14

**Fiscal First Quarter 2026 Preliminary Business Update**

• Total revenue for the quarter was $70.2 million – $70.4 million.

• GAAP loss from operations was ($124.7) million – ($124.9) million.

• Non-GAAP loss from operations was ($57.7) million – ($57.9) million.

• $711.9 million in cash, cash equivalents, and marketable securities as of July 31, 2025.

15
16
17
18

101.  That same day, August 8, 2025, the Company issued a second press release announcing that it was restructuring its sales and services organizations (the "Restructuring Press Release"). The Restructuring Press Release quoted Defendant Siebel discussing the Company's financial performance for the quarter, stating, in relevant part:

19
20
21
22
23
24
25
26
27

The good news is we have completely restructured the sales and services organization, including new and highly experienced leadership across the board to ensure a return to accelerating growth and increased customer success at C3 AI. ***The bad news is that sales results in Q1 were completely unacceptable***. Having given this a lot of thought, I attribute this to ***two factors. One: It is clear that in the short term, the reorganization with new leadership had a disruptive effect. Two: As we have previously announced, I have had a number of health issues in the past six months*** including multiple hospitalizations and vision impairment. Unfortunately, dealing with these health issues prevented me from participating in the sales process as actively as I have in the past. With the benefit of hindsight, ***it is now apparent that my active participation in the sales process may have had a greater impact than I previously thought***.

28

102.    Numerous analysts who had been following C3 lowered their price targets in response to the above disclosures. Oppenheimer, for example, downgraded C3 to "market perform" and removed their price target, highlighting the Company's "extremely weak preliminary 1Q26 results," and especially the Company's "significantly lowered revenue expectations for 1Q26, from ~$105M to ~$70M, implying a 35% sequential decline and a major concern given the recurring nature of its Subscription revenue, suggesting the services are not working as advertised." Similarly, D.A. Davidson downgraded C3 from Netural to Underperform and reduced its price target from $25.00 to $13.00, citing concerns about the "durability of growth" of the Company and stating its fear that "it is likely the business gets worse before it gets better from here."

103.    On this news, the price per share of C3's common stock fell by $5.66, or approximately 25.6%, from a close of $22.13 on August 8, 2025, to close at $16.47 on August 11, 2025. However, the Individual Defendants continued to obfuscate the truth regarding the impact Defendant Siebel's departure would have on the Company.

### *August 21, 2025 Proxy Statement*

104.    On August 21, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Siebel, Sridhar, Levin, McCaffery, Sewell, Davis, Ward, Murray, Hyten, Goldman, Rice, and Snabe solicited the 2025 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

105.    The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Hyten, Levin, and Sewell; (2) to approve the compensation of the Company's named executive officers on an advisory basis; and (3) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for Fiscal Year 2026.

106.    Regarding the "Role of the Board in Risk Oversight," the 2025 Proxy Statement stated the following, in relevant part:

> Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, cyber security, legal and

compliance, and reputational risks. We have designed and implemented processes to manage risk in our operations. Management is responsible for the day-to-day management of risks we face, while our board of directors, as a whole and assisted by its committees, has responsibility for the oversight of risk management. In its risk oversight role, our board of directors has the responsibility to satisfy itself that the risk management processes designed and implemented by management are appropriate and functioning as designed.

While our board of directors is ultimately responsible for risk oversight, our board committees assist our board of directors in fulfilling its oversight responsibilities in certain areas of risk. Our audit committee assists our board of directors in fulfilling its oversight responsibilities with respect to risk management in our major financial risk exposures, information security risk, and the areas of internal control over financial reporting and disclosure controls and procedures. Our nominating and corporate governance committee assists our board of directors in fulfilling its oversight responsibilities with respect to risk management associated with board organization, membership and structure, and corporate governance. Our compensation committee assesses risks created by the incentives inherent in our compensation policies and practices. Our board of directors appreciates the evolving nature of our business and industry and is actively involved with monitoring new threats and risks as they emerge.

Our board of directors believes that open communication with management is essential for effective risk management and oversight. Our board of directors meets with our Chief Executive Officer and other members of our senior management team at quarterly meetings of our board of directors, where, among other topics, management reports to and seeks guidance from our board of directors and its committees with respect to the most significant risks that could affect our business, such as legal risks, information security, cyber security, and privacy risks, and financial, tax, and compliance related risks. In addition, among other matters, management provides our audit committee periodic reports on our compliance programs and investment policy and practices.

107. Regarding the Company's Code of Conduct and its Corporate Governance Guidelines, the 2025 Proxy Statement stated the following:

Our board of directors has adopted corporate governance guidelines that address items such as the qualifications and responsibilities of our directors

and director candidates and corporate governance policies and standards applicable to us in general. In addition, our board of directors has adopted a code of business conduct and ethics that applies to all of our employees, officers, and directors, including our Chief Executive Officer, Chief Financial Officer, and other executive and senior financial officers. The full text of our corporate governance guidelines and our code of business conduct and ethics is posted on the Governance section of our investor relations website ir.c3.ai. We intend to post on our website all disclosures that are required by law or NYSE listing standards concerning any amendments to, or waivers from, any provision of the code of business conduct and ethics.

108.    Regarding the Company's Insider Trading Policy, the 2025 Proxy Statement stated the following:

Our board of directors has adopted an insider trading policy governing the purchase, sale, and or/other dispositions of our securities by our employees, officers, and directors that is designed to promote compliance with insider trading laws, rules and regulations, as well as procedures designed to further the foregoing purposes. In addition, it is our intent to comply with applicable laws and regulations regarding insider trading. Our insider trading policy also prohibits hedging or monetization transactions, including through the use of financial instruments such as prepaid variable forwards, equity swaps, collars, and exchange funds, or similar transactions designed to decrease the risks associated with holding shares of our common stock. In addition, our insider trading policy prohibits trading in derivative securities related to our common stock, which include publicly traded call and put options, engaging in short selling of our common stock, purchasing our common stock on margin or holding it in a margin account, and pledging our shares as collateral for a loan. A copy of our insider trading policy is filed as an exhibit to our Annual Report on Form 10-K for the fiscal year ended April 30, 2025, filed with the SEC

109.    Defendants Siebel, Sridhar, Levin, McCaffery, Sewell, Davis, Ward, Murray, Hyten, Goldman, Rice, and Snabe caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's CEO was in poor health and this was negatively impacting the Company's ability to close deals; (2) Company management was unable to effectively minimize that negative impact; (3) C3 could not execute upon its profit and growth projections as a result; and (4) because of the foregoing, Defendants' public statements were materially false and/or misleading at all

relevant times.

110. The 2025 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; (2) failing to report violations of the Code of Conduct; and (3) engaging in lucrative insider trading. Further, the 2025 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

111. As a result of Defendants Siebel, Sridhar, Levin, McCaffery, Sewell, Davis, Ward, Murray, Hyten, Goldman, Rice, and Snabe causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Hyten, Levin, and Sewell to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) to approve the compensation of the Company's named executive officers on an advisory basis; and (3) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for Fiscal Year 2026.

### The Truth Fully Emerges

112. On August 22, 2025, the truth fully emerged when a stockholder filed the Securities Class Action against C3, Defendant Siebel, and Defendant Lath. The Securities Class Action alleged violations of Sections 20(a) and 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder as a result of the harm suffered to a class of investors who purchased Company stock during the Relevant Period. The Securities Class Actions claims that investors have suffered serious financial harm as a result of the deterioration of C3's securities due to the Individual Defendants' conduct including, *inter alia*, making, or causing the Company to make, the false and misleading statements alleged herein.

### DAMAGES TO C3

113.   As a direct and proximate result of the Individual Defendants' conduct, C3 has lost and will continue to lose and expend many millions of dollars.

114.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

115.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

116.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

117.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

118.   As a direct and proximate result of the Individual Defendants' conduct, C3 has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## **DERIVATIVE ALLEGATIONS**

119.   Plaintiff brings this action derivatively and for the benefit of C3 to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of C3, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

120.   C3 is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

121.   Plaintiff is, and has been at all relevant times, a shareholder of C3. Plaintiff will adequately and fairly represent the interests of C3 in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

122.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

123.   A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, C3's Board consisted of the following twelve individuals: Defendants Siebel, Sridhar, Levin, McCaffery, Sewell, Davis, Ward, Murray, Hyten, Goldman, Rice, and Snabe (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to six of the twelve Director-Defendants that were on the Board at the time this action was filed.

124.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

125.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted C3 to issue materially false and misleading statements. Specifically, the Director-Defendants caused C3 to issue false and misleading statements which were intended to make C3 appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached

their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

126.    Additional reasons that demand on Defendant Siebel is futile follow. Defendant Siebel has served as CEO and as Chairman of the Board since first founding the Company in 2011. Defendant Siebel is also the controlling shareholder of the Company. The Company provides Defendant Siebel with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer and an influential member of the Board, Defendant Siebel was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including those which he personally made. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Siebel solicited the 2025 Proxy Statement which contained false and misleading information contributing to, *inter alia*, shareholders voting to re-elect Defendants Hyten, Levin, and Sewell to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Furthermore, Defendant Siebel's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the scheme. Moreover, Defendant Siebel is named as a defendant in the Securities Class Action. For these reasons, Defendant Siebel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127.    Additional reasons that demand on Defendant Sridhar is futile follow. Defendant Sridhar has served as a Company director since February 2023, and additionally serves as a member of the Audit Committee. Defendant Sridhar has received and continues

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Sridhar solicited the 2025 Proxy Statement, which contained false and misleading information contributing to, *inter alia* shareholders voting to re-elect Defendants Hyten, Levin, and Sewell to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Sridhar breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128.    Additional reasons that demand on Defendant Levin is futile follow. Defendant Levin has served as a Company director since 2010, and additionally serves as a member of the Audit Committee. Defendant Levin has received and continues to receive handsome compensation for his role as a director. Additionally, Defendant Levin solicited the 2025 Proxy Statement, which contained false and misleading information contributing to, *inter alia*, shareholders voting to re-elect himself and Defendants Hyten and Sewell to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, Defendant Levin conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Levin's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Levin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore,

excused.

129.    Additional reasons that demand on Defendant McCaffery is futile follow. Defendant McCaffery has served as a Company director since March 2009, and additionally serves as the Chairperson of the Audit Committee, a member of the Nominating and Corporate Governance Committee, and as the Lead Independent Director. Additionally, Defendant McCaffery solicited the 2025 Proxy Statement which contained false and misleading information contributing to, *inter alia*, shareholders voting to re-elect Defendants Hyten, Levin, and Sewell to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant McCaffery breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130.    Additional reasons that demand on Defendant Sewell is futile follow. Defendant Sewell has served as a Company director since 2017 and additionally serves a member of the Compensation Committee and as the Chair of the Nominating and Corporate Governance Committee. Defendant Sewell has received and continues to receive handsome compensation for his role as a director. Additionally, Defendant Sewell solicited the 2025 Proxy Statement which contained false and misleading information contributing to, *inter alia*, shareholders voting to re-elect himself and Defendants Hyten and Levin to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Furthermore, Defendant Sewell's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the scheme. As a trusted Company director, Defendant Sewell conducted little, if any, oversight of the scheme to

cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Sewell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant Davis is futile follow. Defendant Davis has served as a Company director since December 2021. Defendant Davis has received and continues to receive handsome compensation for her role as a director. Additionally, Defendant Davis solicited the 2025 Proxy Statement which contained false and misleading information contributing to, *inter alia*, shareholders voting to re-elect Defendants Hyten, Levin, and Sewell to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Davis breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

132.    Additional reasons that demand on Defendant Ward is futile follow. Defendant Ward has served as a Company director since December 2021, and additionally serves as a member of the Audit Committee. Defendant Ward has received and continues to receive handsome compensation for his role as a director. Additionally, Defendant Ward solicited the 2025 Proxy Statement which contained false and misleading information contributing to, *inter alia*, shareholders voting to re-elect Defendants Hyten, Levin, and Sewell to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Furthermore, Defendant Ward's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged

herein, further demonstrate his motive in facilitating and participating in the scheme. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Ward breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon his is futile and, therefore, excused.

133.    Additional reasons that demand on Defendant Murray is futile follow. Defendant Murray has served as a Company director since May 2024. Defendant Murray has received and continues to receive handsome compensation for his role as a director. Additionally, Defendant Murray solicited the 2025 Proxy Statement which contained false and misleading information contributing to, *inter alia*, shareholders voting to re-elect Defendants Hyten, Levin, and Sewell to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Murray breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.    Additional reasons that demand on Defendant Hyten is futile follow. Defendant Hyten has served as a Company director since May 2024. Defendant Hyten has received and continues to receive handsome compensation for his role as a director. Furthermore, Defendant Hyten's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the scheme. Additionally, Defendant Hyten solicited the 2025 Proxy Statement which contained false and misleading

information contributing to, *inter alia*, shareholders voting to re-elect himself and Defendants Levin and Sewell to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hyten breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.    Additional reasons that demand on Defendant Goldman is futile follow. Defendant Goldman has served as a Company director since October 2024, and additionally serves as a member of the Audit Committee. Defendant Goldman has received and continues to receive handsome compensation for his role as a director. Additionally, Defendant Goldman solicited the 2025 Proxy Statement which contained false and misleading information contributing to, *inter alia*, shareholders voting to re-elect Defendants Hyten, Levin, and Sewell to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Goldman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136.    Additional reasons that demand on Defendant Rice is futile follow. Defendant Goldman has served as a Company director since October 2024. Defendant Rice has received and continues to receive handsome compensation for her role as a director. Additionally, Defendant Rice solicited the 2025 Proxy Statement which contained false

and misleading information contributing to, *inter alia*, shareholders voting to re-elect Defendants Hyten, Levin, and Sewell to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Rice breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

137. Additional reasons that demand on Defendant Snabe is futile follow. Defendant Snabe has served as a Company director since February 2021, and has additionally served as a special advisor to the Company's CEO since February 2025. Previously, Defendant Snabe served as a special advisor to the Company's CEO from September 2020 to February 2021. Thus, as the Company admits, Defendant Snabe is thus not independent. Additionally, Defendant Snabe solicited the 2025 Proxy Statement which contained false and misleading information contributing to, *inter alia*, shareholders voting to re-elect Defendants Hyten, Levin, and Sewell to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Snabe breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138. Additional reasons that demand on the Board is futile follow.

139. Defendants McCaffery (as Chair), Levin, Goldman, and Davis (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all

relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

140.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

141.    C3 has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for C3 any part of the damages C3 suffered and will continue to suffer thereby.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Thus, any demand upon the Director-Defendants would be futile.

142.  The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

143.  The acts complained of herein constitute violations of fiduciary duties owed by C3's officers and directors, and these acts are incapable of ratification.

144.  The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if there is a directors' and officers' liability insurance policy covering the Director-Defendants. The policy may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of C3, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

145.  If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause C3 to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile

in that event, as well.

146.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

147.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

148.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

149.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

150.    Defendants Siebel, Sridhar, Levin, McCaffery, Sewell, Davis, Ward, Murray, Hyten, Goldman, Rice, and Snabe caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Defendant Siebel was in poor health and this was negatively impacting the Company's ability to close deals; (2) Company management was unable to effectively minimize that negative impact; (3) C3 could not

execute upon its profit and growth projections as a result; and (4) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

151.   The 2025 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Furthermore, the 2025 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

152.   In exercise of reasonable care, Defendants Siebel, Sridhar, Levin, McCaffery, Sewell, Davis, Ward, Murray, Hyten, Goldman, Rice, and Snabe should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the re-election of directors.

153.   As a result of Defendants Siebel, Sridhar, Levin, McCaffery, Sewell, Davis, Ward, Murray, Hyten, Goldman, Rice, and Snabe causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Hyten, Levin, and Sewell to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) to approve the compensation of the Company's named executive officers on an advisory basis; and (3) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for Fiscal Year 2026.

154.   The Company was damaged as a result of Defendants Siebel, Sridhar, Levin, McCaffery, Sewell, Davis, Ward, Murray, Hyten, Goldman, Rice, and Snabe's material

misrepresentations and omissions in the 2025 Proxy Statement.

155.   Plaintiff, on behalf of C3, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

156.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of C3's business and affairs.

158.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

159.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of C3.

160.   In breach of their fiduciary duties owed to C3, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Defendant Siebel was in poor health and this was negatively impacting the Company's ability to close deals; (2) Company management was unable to effectively minimize that negative impact; (3) C3 could not execute upon its profit and growth projections as a result; and (4) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

161.   Also, in breach of their fiduciary duties, the Individual Defendants caused the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Company to fail to maintain internal controls.

162.    In additional breach of their fiduciary duties, six of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of ***approximately $85.1 million***.

163.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of C3's securities.

164.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of C3's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

165.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

166.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, C3 has sustained and continues to sustain significant damages.

As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

167.   Plaintiff, on behalf of C3, has no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

168.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

169.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, C3.

170.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from C3 that was tied to the performance or artificially inflated valuation of C3 or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

171.   Plaintiff, as a shareholder and representative of C3, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

172.   Plaintiff, on behalf of C3, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

173.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

174.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence C3, for which they are legally responsible.

175.   As a direct and proximate result of the Individual Defendants' abuse of control, C3 has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

176.   Plaintiff, on behalf of C3, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

177.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

178.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of C3 in a manner consistent with the operations of a publicly held corporation.

179.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, C3 has sustained and will continue to sustain significant damages.

180.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

181.   Plaintiff, on behalf of C3, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

182.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

184.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused C3 to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

185.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

186.   Plaintiff, on behalf of C3, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Siebel and Lath for Contribution Under Sections 10(b) and 21D of the Exchange Act

187.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188.   C3 and Defendants Siebel and Lath are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Siebel's, and Defendant Lath's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

189.   Defendants Siebel and Lath, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

190.   Accordingly, Defendants Siebel and Lath are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange

Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

191.    As such, C3 is entitled to receive all appropriate contribution or indemnification from Defendants Siebel and Lath.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of C3, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to C3;

(c)    Determining and awarding to C3 the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing C3 and the Individual Defendants to take all necessary actions to reform and improve C3's corporate governance and internal procedures to comply with applicable laws and to protect C3 and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of C3 to nominate at least six candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance

1

2    with applicable laws, rules, and regulations;

  (e)  Awarding C3 restitution from Individual Defendants, and each of them;

3

4      (f)  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

5

  (g)  Granting such other and further relief as the Court may deem just and proper.

6

### JURY TRIAL DEMANDED

7

8    Plaintiff hereby demands a trial by jury.

9

10    Dated: August 29, 2025     Respectfully submitted,

11               **THE BROWN LAW FIRM, P.C.**

12

13               */s/*Robert C. Moest
           Robert C. Moest, Of Counsel, SBN 62166

14               2530 Wilshire Boulevard, Second Floor
           Santa Monica, CA 90403

15               Telephone: (310) 915-6628
           Facsimile: (310) 915-9897

16               Email: RMoest@aol.com

17

18               **THE BROWN LAW FIRM, P.C.**
           Timothy Brown

19               767 Third Avenue, Suite 2501
           New York, NY 10017

20               Telephone: (516) 922-5427

21               Facsimile: (516) 344-6204
           Email: tbrown@thebrownlawfirm.net

22

23               *Attorneys for Plaintiff*

24

25

26

27

28

Verified Shareholder Derivative Complaint

## <u>VERIFICATION</u>

I, Dennis Jaffee, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 8/29/ day of August, 2025.
2025

DocuSigned by:

*Dennis Jaffee*

EB7AC2BC803C497...

Dennis Jaffee